Dissent op
Judge Mills.
í cannot concur with the majority of the court in the opinion just delivered; and as the question is one of some importance, I have thought proper to state my reaSons for that dissent.
First, on the construction of the statute of 1772. Construction, it is true, is a-necessary part of our language. When our laws are so plain as to need no construction, then human language will cease to possess the defects of those who speak it, and will become perfect. Still, however, construction is more necessary in fixing the meaning of a statute, and in settling what it includes, than it is in curtailing the fixed and well know meaning of words. In the first case, it may always b.e applied beneficially; in the latter, it ought to be used sparingly, if ever used at all. In this case, there is scarcely room for any. The party who may issue his execution, is any one that has “ obtained any judgment, decree, or jinal ord'erd’ He may issue “ any legal or proper writ of executionor attachment thereupon, as the case' may required’ To what place or officer directed?' “To the sheriff of the same, or any other county.” Can it be possible, that the words “any judgment, décree or final' order,” include only judgments in detinue, where a distringas must issue, or those which authorised an elegil only? But more still, can the words “any legal or proper writ of execution,' or attachment, which the case may require,” include only attachments, "elegil and dis-tringas, and absolutely exclude writs oí fieri facias and ca. sa. ?. Certainly the exclusion must fix an amendment to the act, as clearly as a legislative proviso, in express *382 words, cdftld do. Tbis, I conceive, is taking ioo great liberty with a legislative act. The direction of the writ, or the county to which it goes, is equally dear, either to the sheriff of the county or that of any other; giving the destination of the writ and1 the election of the county, completely to the holder of the judgment. But it is contended for the appellants, that this election-of, and this destination to, any other county, could not be exercised except in such cases as are prescribed by the act of 1748; that is, the debtor must have-removed himself or his effects out of the county, and then, and not until then, could such election be made.. Apply this to an elegit or a distringas, for a specific chattel, and the reason fails, and: the legislature must be accused of acting unwisely, and to have done nothing by the rule,. A person is sued, who finds it his interest' to live in another county than that where his estate lies; judgment is obtained, and he has not removed himself or his effects. The distringas, in that case, is defeated, the-chattel-recovered, and that on which the writ can operate, is in another county, and there the writ cannot go. Where is the reason for restraining an elegit, which operates on land only, from passing to another county, because the chattels and person are not removed, and permitting it, where they are removed, when the writ itself has no operation upon either person or chattels?' A gentleman, who has an estate, lives at another coun- . ty seat to exercise his profession, or fill an office at the-seat of government; if the construction 'contended' for is correct, then all such are excepted, when it is believed these and such like cases, are those for which the legislature intended to provide.
But the preamble of the act is relied on as fixing the-©onstruction of the enacting part of the statute. It is admitted, that a preamble may be used as shedding light on any ambiguities in the body of the act; and if the-body has relative words to those used in the preamble, then the preamble must be used. But where the enacting part uses terms broader than the preamble, as-this does, it is denied that the preamble can be used to-limit it. Indeed, the converse of this proposition is laid down in all thb books which treat of the subject. The preamble shall not restrain and abridgethe enacting part,, noryetenlarge it, beyond the natural meaning of the expressions, as must be done here. It is true^, the legisla^ *383 tur,a recites in tbe preamble, that tbe law as itaforetime stood, did not permit other writs to go to other counties, 4s,it did writs of/L fa. and ca. sa. in some cases. Buí'in me enacting part, it.places all on the same footing, and allows them to go to any other county or not, at the absolute election of the plaintiff. It did more, then, than remedy the evil which the preamble mentioned.
The second question is one still more intricate, and that on which great reliance was placed in argument. It is contended that the act of 1772, be it broad or narrow in its terms, is repealed by the act of 1792, 1 Litt. L. K. 137. That act did no more than re-enact the act of 1748, and is thus expressed: “ When judgment shall be obtained in any court of record, for any debt or damages, and the person against whom such judgment shall be obtained, remove himself and his effects, or shall reside out of the limits of the jurisdiction of the court, it shall be lawful for the clerk of the court where judgment was given, at the request of the party for whom the same was rendered, to issue any writ oi fieri fiadas or capias ad satisfaciendum, of other legal judicial writ, and direct the same to the sheriff of any other county in this state, where the defendant or debtor, his goods or lands, may be found.”
If the enacting this statute has repealed that of 1772, what becomes of judgments for costs, for a specific chattel in detinue, and judgments for other things? Where are the cases of residence in one county, without an estate there, but with an estate elsewhere, as in the cases before stated? The answer must be, that such case? have remained wholly unprovided for in Kentucky,for upwards of thirty years. Before this conclusion is drawn, the effect which the act t>f 1792 has upon the act of 1772, must be critically examined. The act of W48 was found tobe too narrow. It did not meet all necessary cases. The act of 1772 enlarged it, and embraced, not only the cases provided for by that of 1748, but also every possible case. After we became a state, and the legislature thought proper to transcribe tbe existing Virginia code into our own, they transcribed that of 1748, and omitted that of 1772. The former provided for some cases, the latter for all; but they used no expressions restricting the act of 1772, or directing that executions should go in those cases onljq pointed out in the act of 1792., The real question then- *384 is, as there was an affirmative statute in force, providing f°r every case, and the legislature re-enacted another affirmative statute, providing only for some cases, without any negative words, does the latter act repeal the former? It is a well settled principle, that repeals by implication are not favored in law. Statutes on the subject, áre construed together, as one body of law, and if they can be made consistent with each other, all shall stand, and nothing less than an actual inconsistency or conflict in operation and effect, will warrant an implied repeal. Hence, it is necessary that the latter statute -should contain some negative expressions, such as, in no other case, or not otherwise, or words of that and such like import; or the affirmative proposition contained in tjhe latter statute, must be contrary in its directions, to the affirmative matter of the‘first. F or instance, if one shall direct an office to be kept at a certain place, and the other shall direct it to be kept at another place, as keeping it at the latter place is incompatible with keeping it at the former, and it cannot be kept at both, the latter repeals the former. But this is not.the case here. There is nothing incompatible, and no negative words. Take that of 1772, all -cases are embraced; take that of 1792, part only are embraced, but the residue are not affected,
The only apparent reason, then, that can be given for construing the latter statute as. a repeal of the former, is, that if this be not done, the latter act can have do operation. It would be passing' too high an encomium on the legislative department of government, or, indeed, any other, however learned and respectable it may be, to say that it never did an useless act. And it is denied, that any rule exists in our code, and it is believed that no case can be -found, where, to save a latter statute from the imputation of being unnecessary,, a former, w'hich includes it and embraces much more, -must be held to be repealed by implication only. Words negative, or provisions absolutely inconsistent with each other, arc necessary, and less will not do.
Such will be found to be the law, as laid down in Foster’s case, 10th Rep. 61, which, it is believed, has collated more, both of the rules and cases on this subject, than can’ be found in any one of the reports besides.
*385 It is not, however, admitted, that if a statute or law does exist already, and a case is provided for by it, re-enaction is unnecessary. The common law provides, in most cases, if not in every case, for rights and remedies; yet it is not unfrequent, to find statutes adopted enacting the same things. Statutes often exist, broad in expression and comprehensive, in terms, embracing almost every possible case, and in looking over our code, subsequent ones will be found, providing for only some of those cases. This is frequently the case in our penal code, as will be seen by a minute examination of the statutes at large, and not as abridged in our Digest. In all this mass of legislation, it has not .been once determined that the latter repeals the former. And if such a principle’ should assume existence, it would not be easy to foresee all ;i£s consequences. The truth is, statutes are frequently passed declaratory of the common law, to preserve the principles of the latter. Statutes are repeated by enactment, for the purpose of republication, and to give new effect to their provisions. The last frequently does not include.all the ■ provisions, or provide for all the cases of the first; yet the first remains. If the last includes more than the first, there is only an addition of so much.
It is, however, said, that there is a repealing clause' in the act of 1792. This is true; but it is not a repealing clause of the act of ’1772, in terms, but only of such acts and parts of acts as come within the-purview of the act. This seldom or never amounts to more than what results in an implied repeal. The purview of a statute, is the enacting part, according to the sense given to it by writers, on law; and acts directing matters to be done differently, it is true, from the way they are directed to be done by that statute, are generally repealed by such clause, so far as they differ. But there must, be a real difference and conflict. If one directs a matter to be done in one manner,’ and the latter in another, then thé first is taken from the code; but if the first directs a thing to be 'done in the same mode, and in the same cases as the latter, it is evident the law is unaltered. If the last directs that on certain events,' a thing shall be done, when the first has. directed the same thing to he done, not only en the occurrence of these events, but also on the happening of others, it cannot follow, that on these latter events the thing cannot be *386 done, or that it Can be done on the existence of the former only; and this is the case that has happened here.
But the impolicy of this construction, and arguments ab inconvenienli, have been urged on the re-argument of this question. It has been said, that great sacrifices might be produced by clandestinely passing executions to other counties, and property might be there taken, or even the body, at great inconvenience. ' This latter argument supposes that a defendant may be ignorant of a judgment, or that he has a right to disregard it, until he is reminded of.it by execution. This certainly is an untenable proposition. A defendant is.not only a party to a judgment, but the party convict, and is bound to prepare for, and to notice every step in its execution. By paying it, he can avoid the consequences. By observing the records of the clerk, he can find whither the execution is gone. If he doe's not pay it, and has estate in another county, sufficient, he is bound to surrender it, and it cannot be either just or politic to screen him from doing so. It will be found, by such a protection, evils will result, some of which have been noticed, more than sufficient to counterbalance the evils supposed on the opposite side.
Besides, as to the policy, it is denied that a country like ours can exist without such a provision as the act of 1772, for a length of time, without great evils. Just so much estate as a debtor chooses to keep in the county where he resides, will be subject to' his debts, and no more. This may, and in many cases will be a greater exemption of estate from execution, than would be the reservation of lands or negroes. The county where he lives may be ransacked, and when that is cleared of his estate, although across the line of a neighboring county, he may possess an estate affording immense revenues, yet it is secure, and his debt is unpaid. A great evil this, wdiere estates are much divided, as great estates usually are; and the greater the estate, so much greater is the protection afforded. In England, from whence we drew our jurisprudence, all important controversies are drawn into, and decided by the courts of Westminster Hall, from whence the process could reach every part of the kingdom; hence, these evils could not exist. Here; we have found it not only convenient, .but necessary, that our judgments should be rendered by local courts, near the doors of *387 everyone; henee, it became necessary that the process t.o execute the judgments of these iocal courts should run beyond the territorial limits ofthe county; otherwise, what appeared to be a convenience, would amount, in numerous instances, to injustice; and to remedy this, the legislature of Virginia adopted the act of 1772, and its provisions ought not to be given up, except by an unequivocal expression of the • legislative, will.
1 have been thus lengthy ijn discussing this question, because I suppose the effects of a contrary doctrine will be momentous, and may shake many rights which have been supposed to be stable, under a contrary practice, lam aware, that the execution books of the different courts will furnish numerous executions which have been sent abroad and expended their force in other counties, until they have gleaned enough to pay the judgments. And so long as I have been conversant with the courts of the country, I never recollect of hearing the question-made, successfully, more than once, and that in the case of a ca. sa. levied under circumstances of peculiar hardship, before a tribunal not well skilled in either common or.statute law. Such motions are not limited. The residence of the debtor at a former day, may .be easily proved, while the removal of himself or his goods may bé more difficult, by lapse of time and death of witnesses.. As observed in argument, the onus probandi, in ail such cases, must lie on the bolder of the execution; hence, their destruction may often be certain, and also fatal to those who have purchased estates under them. Indeed, according to the doctrine contended for, it may be plausibly urged, that the removal of the debtor or his effects are necessary prerequisites, to authorise the clerk to send the execution abroad, and that as he had no authority where these did not exist, the executions are- void', and ought to be so decided, when used to establish any right or title collaterally. Not only the avoidance of these- consequences, but the cotemporaneous exposition, of. the-laws as they have stood heretofore, furnish strong persuasive arguments, not tp adopt such aprinciple^unless; compelled by the imperious rules of law.
I still contend that the case of Brydie vs. Langham does not contravene this doctrine, except by implica^ lion. It is impossible to read that case, and the argu? *388 nients of counsel, the Court not having given its reasons, and to believe that the act of 1772 was considered by the court. The only fair inference from it, is, that if the act of 1772 was entitled to a different construction, it would have been noticed. It cannot be a strong inference, which, draws from silence strong conclusions. We well know, that acts have, and will, when numerous, escape the attention of both courts and counsel, and this was true in the case cited.
Note_That the subject discussed in -the preceding opinions, is involved in groat difficulties, admits of no doubt.. I submit to the consideration of the reader, whether the phraseology of a part of the first constitution, will give any aid in removing them. The clause I refer to, is in the following words: “ All laws now in force in the state of Virginia, See. shall be in force, until they shall be altered or repealed by the legislature.” I Litt. 31. The question Í would propose, is not, what efféct shall be given to the word, altered; but whether-arey effect shall be given-to it. Every lawyer will see the consequences, and I may add, the difficulties, which will result, in a vast number of oases, from giving it any effect.
By the act of 1792, the Virginia law on this subject was certainly altered, though less materially than it washy the act of 1796. In the latter act, the word or, is substituted in place of and; consequently, although before the piffesage of that act, viz. by the acts of 1748 and 1792, execution could not go into another county, unless a man removed both himself and his effects, yet now, under the act of 1796', a removal of either, gives the plaintiff that privilege.
, Admitting the act of 1796 to be the only law in foroe on the subject, it is hoped the following queries will show the necessity of legislative interference: 1. Must a man remove ail his effects, before he is liable under it, or will the removal of a part subject him ? 2. If the removal of a part will subject him, what part will be sufficient? 3. If he is not subjected until be shall removo the whole, and this is know» to be the law, will any man ever remove the whole ? 4. What will be the effect on purchasers, as well as parties, if it shall appear, ex post fado, at any indefinite period of time, that an execution had issued to another county, when no fact existed which could justify the measure ?
Although I have referred to the first constitution in this ease, because the act of 1796 was passed under it, it may not be improper to observe, that the same questions, as to other lavys, may arise under our present constitution. Vide 1 Litt. p. 51,